IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH DIVISION

| | |
|---|---|
| BLAIR DOUGLASS,<br><br>        Plaintiff,<br><br>   v.<br><br>LINEN LION, LLC,<br><br>        Defendant. | Civil Action No. 2:26-cv-1272<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Blair Douglass ("Douglass" or "Plaintiff") brings this action against Defendant Linen Lion, LLC ("Crap Eyewear" or "Defendant"), and makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations pertaining to Douglass, which are based on personal knowledge:

## **NATURE AND SUMMARY OF THE ACTION**

1. Defendant owns, leases, and/or operates physical facilities, including corporate offices, manufacturing facilities, shipping and distribution centers.

2. From its physical facilities, Defendant makes various goods, like eyewear, and services, like customer service, return processing, and technical support, available to consumers in Pennsylvania and across the country.

3. Consumers may remotely access the goods and services at Defendant's physical facilities by email, or through the internet at Defendant's website, located at https://www.crapeyewear.com/ ("Website").

4. Douglass is legally blind.

1

5.     As a result of his blindness, Douglass uses screen reader auxiliary aids to remotely access the goods and services available at Defendant's physical facilities through the Website.

6.     This action arises from Defendant's ongoing failure to effectively communicate with Douglass because the Website is not sufficiently compatible with screen reader auxiliary aids, thereby denying Douglass full and equal access to the goods and services available at Defendant's physical facilities.

<u>**JURISDICTION AND VENUE**</u>

7.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

8.     Upon information and belief, Defendant promotes the Website, and the goods and services it sells via the Website, in Pennsylvania and to consumers who Defendant knows reside in Pennsylvania.

9.     Defendant's in-state sales through the Website, and Defendant's in-state promotion of the Website and the goods and services thereon, are closely related to Douglass's claim that Defendant discriminates against blind shoppers when selling Defendant's goods and services on the Website.

10.     Defendant purposefully avails itself of the privilege of conducting activities in Pennsylvania by operating an interactive commercial website that facilitates the knowing and repeated transmission of computer files into Pennsylvania over the internet.[1]

---

[1] *See Murphy v. Rolex Watch USA, Inc.*, No. 1:23-CV-00086-SPB, 2024 U.S. Dist. LEXIS 84515, at *17-18 (W.D. Pa. May 9, 2024) (Lanzillo, M.J.) (exercising personal jurisdiction over out-of-forum website operator in a website accessibility case); *Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa. Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Schwab, J.) (same).

11.     Upon information and belief, Defendant places files of information, or cookies, on the hard drives of the computers, smartphones, and other devices of every Pennsylvania consumer when those devices are used to visit the Website.[2]

12.     Douglass was injured when he attempted to remotely access the goods and services available at Defendant's physical facilities through the Website while Douglass was physically located in Pittsburgh, Pennsylvania.

13.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Douglass's claims occurred.

## PARTIES

14.     Douglass is a natural person over the age of 18.

15.     He resides in and is a citizen of Pittsburgh, Pennsylvania.

16.     He works for an area university as a Program Administrator, managing all phases of the admission process for a highly competitive science training program. Douglass is also a licensed Pennsylvania attorney. He graduated from the University of Pittsburgh School of Law. While at Pitt Law, Douglass completed a judicial internship in the United States District Court for the Western District of Pennsylvania.

17.     Douglass has advocated for blind individuals his entire life.[3]

---

[2] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf.

[3] Zak Koeske, *Pitt student aims to rise above stereotype*, Pittsburgh Post-Gazette (July 23, 2009), https://www.post-gazette.com/local/south/2009/07/23/Pitt-student-aims-to-rise-above-stereotype/stories/200907230364 ("Blindness can't hold you back from doing anything you want to do[.] …Blindness is simply a physical condition. You have to make a few adaptations, but those aren't big enough to affect your ability to do a job competently. …There are always going to be some people who doubt your ability. ... I have no trouble trying to prove them wrong.").

18. Seven different judges in the United States District Court for the Western District of Pennsylvania have appointed Douglass to represent nationwide classes of blind consumers in class actions concerning the inaccessibility of commercial websites, including most recently in *Douglass v. Levain Bakery Cookie Co., LLC*, No. 2:25-cv-01722, 2026 U.S. Dist. LEXIS 65659 (W.D. Pa. Mar. 26, 2026) (Kelly, J.), *Douglass v. DK Household Brands Corp.*, No. 2:25-cv-01183, 2026 U.S. Dist. LEXIS 65297 (W.D. Pa. Mar. 25, 2026) (Wiegand, J), and *Douglass v. Melnor, Inc.*, No. 2:25-cv-00670, 2025 U.S. Dist. LEXIS 203770 (W.D. Pa. Oct. 16, 2025) (Hardy, J.).

19. Defendant is a Delaware limited liability company with a principal place of business in California.

20. Defendant offers goods and services to the public from physical facilities that Defendant owns, operates, and/or controls, including its corporate offices, manufacturing facilities, and shipping and distribution centers.

21. Defendant's physical facilities are open to the public, as Defendant allows the public to access the goods and services available at its physical facilities remotely through the Website.

## STANDING UP FOR TITLE III OF THE ADA

22. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited

access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[4]

23.    More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[5] and private individuals[6] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[7]

24.    Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[8] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[9]

25.    The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[10]

---

[4] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[5] 42 U.S.C. § 12188(b).
[6] 42 U.S.C. § 12188(a).
[7] Johnson, *supra* note 5.
[8] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[9] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).
[10] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

26.    Consistent with these policies, Douglass files this case to ensure Defendant provides full and equal access to the goods and services that Defendant makes available to the public from its physical facilities.

**<u>SUBSTANTIVE ALLEGATIONS</u>**

27.    Screen reader auxiliary aids allow blind persons to use websites and mobile apps to remotely access physical facilities, and the goods and services retailers provide at those physical facilities, like customer service, return processing, and technical support.

28.    Two of the most commonly used aids are JAWS from Freedom Scientific (available on Windows computers), and VoiceOver (available on macOS and iOS devices).

29.    "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[11]

---

[11] *JAWS® Screen Reader*, Vispero, https://vispero.com/jaws-screen-reader-software/ (last accessed June 1, 2026).

30.    "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. Auditory descriptions of elements help you easily navigate your screen through simple gestures on a touchscreen or trackpad or a Bluetooth keyboard. . . . VoiceOver can also describe people, objects, text, and graphs in greater detail than ever. It's available in more than 60 languages and locales on iPhone, iPad, Mac, Apple Watch, Apple TV, and HomePod and offers deep customization options for your needs. Select and modify your favorite built-in voice for speech feedback, and tailor its verbosity, speed, and accompanying sound and haptic feedback to your own preferences."[12]



31.    The images to the right show a retailer coding its website so that blind shoppers can remotely access physical facilities, and the goods and services provided at those physical facilities.




32.    The first image illustrates what shoppers perceive visually when browsing the retailer's website with an iPhone. The second image shows the audio description highlighted for that image in green.

---

[12] *Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed June 1, 2026).

33.    Although invisible to the eye, screen reader auxiliary aids read the highlighted text of the second image aloud to describe that image to shoppers who cannot perceive content visually.

34.    In this example, when a screen reader user tabs to the image file, the website announces, "[o]ne burlap and cotton tote bag with a custom printed architectural company logo."

35.    Blind shoppers require audio descriptions, frequently called "alternative text," like this to access physical facilities, and the goods and services provided at physical facilities, through a website.

36.    Unfortunately, Defendant fails to effectively communicate with Douglass because the Website is not sufficiently compatible with screen reader auxiliary aids, thereby denying Douglass full and equal access to the goods and services available at Defendant's physical facilities.

37.    For example, from visiting the Website in February 2026, and from investigations performed on his behalf, Douglass learned that Defendant failed to effectively communicate with him, and with all blind screen reader users, in at least the following ways:

(a)    Defendant visually communicates information about prices and discounts. Consumers who perceive content visually see that many products available for purchase include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. Consumers who perceive content visually will understand that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website lacks sufficient alternative text to verbally communicate the meanings of each font. This ineffective communication makes it difficult, or impossible, for Plaintiff to determine the price of Defendant's products. *See* Dennis, *Strikethrough*

*Accessibility*, WebAxe.org (Oct. 21, 2023), https://www.webaxe.org/strikethrough-html-accessibility/ (utilizing strikethrough with visually hidden text to programmatically convey strikethrough semantics "will ensure that everyone understands strikethrough semantics while browsing the web which often means knowing the correct price of a product or service"). Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1163751694/ba8b842068.

(b)    Defendant visually communicates customer support information in a pop-up window on the Website. Consumers who perceive content visually will see the pop-up and can interact with it to access Defendant's customer support services. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify screen reader users when the pop-up appears. This ineffective communication makes it difficult, or impossible, for Plaintiff to find the help he needs or report the Website's access barriers so they can be fixed. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1163751800/2ce90c2466.

(c)    Defendant visually communicates information about the size of a consumer's order, as well as how consumers can easily increase or decrease the size of their order with the click of a button. Consumers who perceive content visually will recognize the "decrease quantity" and "increase quantity" buttons on the Website and understand that by clicking them, Defendant will decrease and increase the size of their order accordingly. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because these buttons lack alternative text to verbally communicate their purpose. This ineffective communication makes it more difficult, or impossible, for Plaintiff to adjust his order with the

same ease and certainty as can shoppers who are not blind. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1163751979/c98b467f28.

(d)    Defendant visually communicates product sizing information in a pop-up window on the Website. Consumers who perceive content visually will see an information icon next to the "Fit" listed the Website's product pages. These consumers can click the icon and see the measurement details in the corresponding pop-up. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify screen reader users when this pop-up appears. This ineffective communication makes it more difficult, or impossible, for Plaintiff to learn more about the sizing of Defendant's products. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1163752046/93ac4899e9.

(e)    Defendant announces various invisible links, words, and phrases and an invisible, automatically expanded menu to screen reader users. Screen reader users must tab through all of this content before accessing the actual content of the Website, and they must repeat this process on every new page of the Website they visit. This ineffective communication makes it difficult, or impossible, for screen reader users, including Plaintiff, to reach the content of the Website's webpages to browse, research, and purchase Defendant's products. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1163752177/a72c141275.

38.    Consistent with public policy encouraging the resolution of "dispute[s] informally by means of a letter[,]" *see Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006), which "prelitigation solutions [are] clearly, the most expedient and cost-effective means of resolving" digital accessibility claims, *see Sipe v. Am. Casino & Ent.*

10

*Properties*, LLC, 2016 WL 1580349, at *2-3 (W.D. Pa. Apr. 20, 2016), Douglass, through his counsel, contacted Defendant at store@crapeyewear.com on March 27, 2026, April 13, 2026, and April 29, 2026 to discuss the discrimination that Plaintiff experienced on Defendant's Website and the resolution of Plaintiff's claim. Unfortunately, that attempt was unsuccessful.

39.     Douglass returned to the Website in June 2026. From visiting the Website again, and from additional investigations performed on his behalf, Douglass learned that Defendant still fails to effectively communicate with him, and with all blind screen reader users, in at least the following ways:

(a)     Defendant visually communicates information about prices and discounts. Consumers who perceive content visually see that many products available for purchase include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price— does not. Consumers who perceive content visually will understand that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website lacks sufficient alternative text to verbally communicate the meanings of each font. This ineffective communication makes it difficult, or impossible, for Plaintiff to determine the price of Defendant's products. *See* Dennis, *Strikethrough Accessibility*, WebAxe.org (Oct. 21, 2023), https://www.webaxe.org/strikethrough-html-accessibility/ (utilizing strikethrough with visually hidden text to programmatically convey strikethrough semantics "will ensure that everyone understands strikethrough semantics while browsing the web which often means knowing the correct price of a product or service"). Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1198425982/7e6c552e62.

11

(b)      Defendant visually communicates customer support information in a pop-up window on the Website. Consumers who perceive content visually will see the pop-up and can interact with it to access Defendant's customer support services. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify screen reader users when the pop-up appears. This ineffective communication makes it difficult, or impossible, for Plaintiff to find the help he needs or report the Website's access barriers so they can be fixed. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1198425979/8d1087049e.

(c)      Defendant visually communicates information about the size of a consumer's order, as well as how consumers can easily increase or decrease the size of their order with the click of a button. Consumers who perceive content visually will recognize the "decrease quantity" and "increase quantity" buttons on the Website and understand that by clicking them, Defendant will decrease and increase the size of their order accordingly. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because these buttons lack alternative text to verbally communicate their purpose. This ineffective communication makes it more difficult, or impossible, for Plaintiff to adjust his order with the same ease and certainty as can shoppers who are not blind. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1198425981/d8efa5a9c2.

(d)      Defendant visually communicates product sizing information on the Website. Consumers who perceive content visually will see an information icon next to the "Fit" listed on many of the Website's product pages. These consumers can click the icon to learn more about the measurements of Defendant's products. Defendant fails to effectively communicate this same information to screen reader users, including Plaintiff, because the Website fails to notify

12

screen reader users of the existence of the icon. This ineffective communication makes it more difficult, or impossible, for Plaintiff to learn more about the sizing of Defendant's products. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1198425980/e19007e881.

(e)     Defendant announces various invisible links, words, and phrases and an invisible, automatically expanded menu to screen reader users. Screen reader users must tab through all of this content before accessing the actual content of the Website—if they can ever access the actual content of the Website by tabbing—and they must repeat this process on every new page of the Website they visit. This ineffective communication makes it difficult, or impossible, for screen reader users, including Plaintiff, to reach the content of the Website's webpages to browse, research, and purchase Defendant's products. Click the following link to view a short video demonstrating this access barrier: https://vimeo.com/1198426010/e3f661274f.

40.     Defendant's ongoing failure to effectively communicate with Douglass, together with Defendant's insufficient policies and practices giving rise to this ineffective communication, deny Douglass full and equal access to Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

41.     Defendant's ongoing failure to effectively communicate with Douglass, together with Defendant's insufficient policies and practices giving rise to this ineffective communication, humiliate and deter Douglass from using the Website to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

42.     Still, Douglass intends to return to the Website within the next six months to determine if Defendant effectively communicates with Douglass and, if so, to attempt to access

Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

<u>**SUBSTANTIVE VIOLATION**</u>

**Title III of the ADA, 42 U.S.C. § 12181 *et seq.***

43.     The assertions contained in the previous paragraphs are incorporated by reference.

44.     Douglass is a person with a "disability." 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

45.     Defendant is a "public accommodation." 42 U.S.C. §§ 12181(7)(E).

46.     Defendant violated the ADA by, among other things, denying Douglass the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations; denying Douglass an opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; providing Douglass an unequal opportunity to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations; excluding Douglass, denying him services, and treating him differently than others because of the absence of auxiliary aids and services, or the failure to modify policies and practices; and failing to effectively communicate with Douglass. 42 U.S.C. §§ 12182(a), 12181(b)(1)(A)(i), 12181(b)(1)(A)(ii), 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iii).

47.     These violations denied Douglass full and equal access to Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities.

48.     These violations also humiliate and deter Douglass from using the Website to access Defendant's physical facilities and the goods and services Defendant makes available at its physical facilities, thereby forcing Douglass to wait until Defendant elects to retrofit the Website to be accessible.

**PRAYER FOR RELIEF**

WHEREFORE, Douglass requests judgment as follows:

(A)    A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took insufficient action to ensure Douglass could use the Website to fully, equally, and independently access Defendant's physical facilities and the goods and services that Defendant makes available at its physical facilities;

(B)    A permanent injunction under 42 U.S.C. § 12188(a)(2) and 28 C.F.R. § 36.501 which directs Defendant to take all steps necessary to ensure Defendant's physical facilities and the goods and services that Defendant makes available at its physical facilities are fully, equally, and independently accessible to Douglass by the Website, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following policies and practices that will cause Defendant to remain in compliance with the law— the specific injunctive relief requested by Douglass is described more fully below;

(1)    Within 60 days of the Court's order, Defendant shall designate a team of its employees and/or contractors as the accessibility coordination team for the Website, which team will be responsible for ensuring Defendant's compliance with the Court's order;

(2)    Within 90 days of the Court's order, Defendant shall appoint or retain an Accessibility Consultant who is knowledgeable about digital accessibility, the ADA, and the Web Content Accessibility Guidelines 2.1 A/AA, developed by the W3C and available at https://www.w3.org/TR/WCAG21/. The Accessibility Consultant's duties shall include assisting Defendant in ensuring the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users.

(3)    Within 120 days of the Court's order, Defendant shall develop and implement an Accessibility Strategy designed to ensure the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users within 18 months of the Court's order.

(4)    Within 120 days of the Court's order, Defendant shall develop and publish an Accessibility Statement that advises visitors that Defendant is making efforts to ensure that its Website conforms with Web Content Accessibility Guidelines 2.1 A/AA and provides effective communication to screen reader users, and includes an accessibility feedback form that invites visitors to contact Defendant with their accessibility concerns or questions. Defendant shall add a link at the beginning of the Website's landing pages, directing screen reader users to the Accessibility Statement.

(5)    Within 150 days of the Court's order, Defendant shall ensure its customer service personnel are trained to assist individuals with disabilities (including individuals who are blind) who encounter difficulties using the Website, and to forward any accessibility-related questions or complaints to Defendant's accessibility coordination team so they may be remediated.

(6)    Within 180 days of the Court's order, Defendant shall modify its existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to fail to provide effective communication to screen reader users. Defendant shall ensure that any bugs that cause the Website to fail to provide effective communication to screen reader users are remedied with the same level of priority (*e.g.*, speed, resources used to remedy, etc.) as any other equivalent loss of function for individuals who are not blind.

(7)    Within 210 days of the Court's order, Defendant shall train all employees responsible for website or mobile application design, development, or maintenance to ensure the

16

future design, development, and maintenance of the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen reader users. Defendant shall provide accessibility training to all newly-hired employees responsible for website or mobile application design, development, or maintenance within the latter of 210 days of the Court's order or 90 days of their hire date. Commencing in 24 months of the Court's order, Defendant shall ensure that all then-current employees responsible for website or mobile application design, development, or maintenance are provided with refresher accessibility training at regular intervals that shall not exceed two years.

(8)    Until further ordered by the Court, Defendant or its Accessibility Consultant shall perform an automated accessibility audit on at least a monthly basis to evaluate whether the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the monthly accessibility audit shall include each home or landing page of the Website, and a sampling of web pages that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(9)    Until further ordered by the Court, Defendant or its Accessibility Consultant shall perform end-user accessibility/usability testing on at least a quarterly (four times per year) basis to evaluate whether the Website conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers. At minimum, the quarterly end-user accessibility test shall include each home or landing page of the Website, as well as a sampling of web pages that that visitors would access to (a) perform a search, (b) view a product, (b) complete a purchase, and (d) contact customer service.

(10)    Until further ordered by the Court, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor

17

to provide content that conforms with Web Content Accessibility Guidelines 2.1 A/AA, and provides effective communication to screen readers.

(11)    Defendant shall provide Douglass, through his counsel, with a report on the first, second, and third anniversaries of the Court's order which summarizes the progress Defendant is making in meeting its obligations under the Court's order.

(C)    Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)    Payment of costs of suit;

(E)    Payment of reasonable attorneys' fees under 42 U.S.C. § 12205 and 28 C.F.R. § 36.505, including costs to monitor Defendant's compliance with the judgment;[13]

(F)    Whatever other relief the Court deems just, equitable and appropriate; and

(G)    An order retaining jurisdiction over this case until Defendant has complied with the Court's orders.

Dated: June 10, 2026

*/s/ Stephanie Moore*

Kevin W. Tucker (He/Him) (PA 312144)
Stephanie Moore (She/Her) (PA 329447)
Kayla Conahan (She/Her) (PA 329529)
**EAST END TRIAL GROUP LLC**
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
🅕 🅛 🆈 🅞
Tel. (412) 877-5220
Fax. (412) 626-7101
ktucker@eastendtrialgroup.com
smoore@eastendtrialgroup.com
kconahan@eastendtrialgroup.com

---

[13] *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987); *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11).